Kaleigh N. Boyd (OSB #253094)
kboyd@mcnaul.com
**McNAUL EBEL PLLC**
600 University Street, Suite 2700
Seattle, Washington 98101
Tel: (206) 467-1816
Fax: (206) 624-5128

[*Additional Attorneys on Signature Page*]

*Attorneys for Plaintiffs & the Proposed Class*

**UNITED STATES DISTRICT COURT**
**DISTRICT OF OREGON**

| | |
|---|---|
| DEBORAH ESTEP and GORDON ROGER RISSLER, on behalf of themselves and all others similarly situated,<br><br>*Plaintiffs*,<br><br>v.<br><br>SILVER FALLS DERMATOLOGY, LLC D/B/A FRONTIER DERMATOLOGY,<br><br>*Defendant.* | Civil Action No.: 6:26-cv-02442<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Deborah Estep and Gordon Roger Rissler bring this class action lawsuit on behalf of themselves and all others similarly situated, by and through undersigned counsel, and hereby allege the following against Defendant Silver Falls Dermatology, LLC d/b/a Frontier Dermatology ("Frontier").[1] Facts pertaining to Plaintiffs and their experiences and circumstances are alleged

[1] *See* https://www.frontierdermatology.com/our-story/; *see also* https://records.sos.state.or.us/ORSOSCMSearch/Search/RecordViewer.aspx?uri=16284121.

based upon personal knowledge, and all other facts alleged herein are based upon investigation of their counsel and, where indicated, upon information and good faith belief.

**NATURE OF THE ACTION**

1. When patients and prospective patients use Frontier Dermatology's website to look up a skin condition, find a dermatologist, or book an appointment, they expect that information to stay between them and their doctor. Instead, hidden code that Frontier put on its website sends all of that information to Google.

2. Frontier controls and operates medical and cosmetic dermatology clinics throughout Washington and Oregon.

3. In order to market, sell, and provide its medical services, Defendant operates and controls a website, https://frontierdermatology.com, through which patients and prospective patients communicate with Frontier regarding their protected health information, dermatological medical care, and appointments (the "Website"). Plaintiffs' claims concern Defendant's deployment of surreptitious third-party tracking technologies on the Website.

4. Plaintiffs bring this class action lawsuit to address Frontier's illegal and widespread practice of disclosing its patients' confidential personally identifiable information ("PII") and protected health information ("PHI," and together with PII collectively referred to as "Private Information") to unauthorized third-party advertisers including, but not limited to, Alphabet, Inc./Google LLC ("Google").

5. Defendant represents to its patients that "*We do not sell, share, or distribute your information to third parties for marketing purposes without your explicit consent*."[2]

---

[2] *Privacy policy*, https://web.archive.org/web/20260503194400/https://www.frontierdermatology.com/privacy-policy-2/ (emphasis added). It appears that at some point after May 3, 2026 (after Plaintiffs began

6. Despite and contrary to these representations, Frontier installed and configured Google Analytics, Google DoubleClick, third-party cookies, and related tracking tools on the Website (collectively, the “Tracking Technologies”).[3] As patients and prospective patients used the Website, the Tracking Technologies sent Google the contents of their communications—the skin condition they were researching, the provider and clinic they chose, and the fact that they were booking an appointment—along with IP addresses and Google cookie identifiers, such as the Client ID (“CID”), that let Google tie that information to a specific person and, for Google account holders, to their Google account.

7. Simply put, the health information disclosed through the Tracking Technologies is personally identifiable.

8. Google uses this information to build advertising profiles and sell targeted ads. Frontier gets something in return: access to Google Analytics and Google’s other marketing, advertising, and analytics software (collectively, the “Business Tools”), and cheaper, better-targeted marketing aimed at the same patients whose information it gave away. Both Plaintiffs were later served Frontier ads.

9. The process of adding third-party Tracking Technologies to webpages is a multi-step process that must be undertaken *by the website owner*. Frontier is one of the companies that has chosen to prioritize its marketing efforts and profits over the privacy of its patients and potential patients.

---

using the Website), Frontier changed its Privacy Policy, as discussed in more detail *infra*. Regardless, this version of the Privacy Policy also promises not to disclose patients’ PHI.

[3] While this Complaint details Frontier’s use of Google’s tracking tools, Plaintiffs’ counsel have found evidence that Defendant was utilizing the Meta Pixel from Meta (formerly Facebook) on its Website as late as January 2025. The full extent of Defendant’s tracking of its Website users’ Private Information can only be determined through discovery.

10. By installing and configuring Tracking Technologies on its Website, Defendant effectively planted a bug in Plaintiffs' and Class Members' web browsers that caused their communications to be intercepted, accessed, viewed, and captured by third parties in real time, as they were communicated by patients and prospective patients based on the parameters Defendant chose to implement.

11. Each of the Plaintiffs and Class Members used the Website and had their Private Information tracked by Defendant using the Tracking Technologies. However, Defendant ***never*** obtained authorization from Plaintiffs or Class Members to share their Private Information with third parties.

12. Health information is highly regulated by both state and federal law, including the Health Insurance Portability and Accountability Act ("HIPAA"), which imposes criminal penalties on disclosing individually identifiable health information ("IIHI") to a third party without express written authorization, including any information that "is created or received by a health care provider" and "relates to the past, present, or future physical or mental health or condition of an individual, the provision of health care to an individual, or the past, present, or future payment for the provision of health care to an individual[.]"[4]

13. Defendant is a healthcare entity and thus its disclosure of health and medical communications constitutes a violation of HIPAA.

14. To make matters worse, Frontier has ***not*** informed its users of the unauthorized disclosure of their Private Information, as many other healthcare entities that have utilized similar tracking technology to collect and disclose Private Information to third parties have done.[5]

---

[4] 42 U.S.C. § 1320d(6).

[5] In stark contrast to Frontier, in the last few years several medical providers that installed the Meta

15. The reason Frontier goes to these lengths to obtain this sensitive Private Information is, quite simply, because its users would ***not*** provide it if they were informed and given a choice. That is, if Frontier told its patients that by using its Website their sensitive Private Information would be collected and disseminated to Google (or other third-party platforms), users would deny consent and/or demand significant compensation for the use of their private and valuable health information in this manner.

16. Plaintiffs bring this action for legal and equitable remedies to address and rectify the illegal conduct and actions described herein, to enjoin Defendant from making similar disclosure of its patients' Private Information in the future, and to fully articulate, *inter alia*, the specific Private Information it disclosed to third parties and the recipients of that information.

17. Defendant breached its statutory and common law obligations to Plaintiffs and Class Members by, *inter alia*: (i) installing and configuring, and then failing to remove or disengage, technology that was known and designed to share web-users' information; (ii) failing to obtain the written consent of Plaintiffs and Class Members to disclose their Private Information to Google or others; (iii) failing to take steps to block the transmission of Plaintiffs' and Class Members' Private Information through Tracking Technologies like Google Analytics and Google DoubleClick; (iv) failing to warn Plaintiffs and Class Members; and (v) otherwise failing to design and monitor its Website to maintain the confidentiality and integrity of patient Private Information.

---

Pixel on their Web Properties have provided their patients with notices of data breaches caused by the Pixel transmitting PHI to third parties. *See*, *e.g.*, *Cerebral, Inc. Notice of HIPAA Privacy Breach*, https://cerebral.com/static/hippa_privacy_breach-4000c6eb21449c2ecd8bd13706750cc2.pdf; Annie Burky, *Advocate Aurora says 3M patients' health data possibly exposed through tracking technologies,* FIERCE HEALTHCARE (Oct. 20, 2022), https://www.fiercehealthcare.com/health-tech/advocate-aurora-health-data-breach-revealed-pixels-protected-health-information-3; *Novant Health Notifies Patients of Potential Data Privacy Incident*, PR NEWSWIRE (Aug. 19, 2022), https://www.prnewswire.com/news-releases/novant-health-notifies-patients-of-potential-data-privacy-incident-301609387.html.

18. As a result of Defendant's conduct, Plaintiffs and Class Members have suffered numerous injuries including, but not limited to: (i) invasion of privacy; (ii) loss of benefit of the bargain; (iii) diminution of value of their Private Information; (iv) statutory damages; and (v) the continued and ongoing risk to their Private Information.

19. Plaintiffs seek to remedy these harms and bring causes of action for (i) violation of the Electronic Communications Privacy Act ("ECPA"), 18 U.S.C. § 2511(1), *et seq.*; (ii) breach of confidence; (iii) invasion of privacy/intrusion upon seclusion; and (iv) unjust enrichment.

## PARTIES

20. Plaintiff Deborah Estep is, and at all relevant times was, an individual residing in Snohomish County, in the State of Washington.

21. Plaintiff Gordon Roger Rissler is, and at all relevant times was, an individual residing in Clark County, in the State of Washington.

22. Defendant Silver Falls Dermatology, LLC d/b/a Frontier Dermatology is a limited liability company organized in the State of Oregon with its principal place of business in Salem, Oregon.

## JURISDICTION & VENUE

23. This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1331 because this Complaint asserts a claim for violation of federal law, the ECPA, 18 U.S.C. § 2511. This Court also has supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a) because all claims alleged herein form part of the same case or controversy.

24. This Court also has subject matter jurisdiction over this action under 28 U.S.C. § 1332(d) because this case is brought as a class action where the amount in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, there are more than 100 members

in the proposed class, and one or more putative Class Members including Plaintiffs are citizens of a different state than Defendant.

25. This Court has personal jurisdiction over Frontier because Defendant is located in the State of Oregon – specifically, in this District, the parties are citizens of different states, and the amount in controversy exceeds $75,000, 28 U.S.C. § 1332(a)(1). Additionally, this Court has personal jurisdiction over Defendant because Frontier is authorized to conduct and regularly conducts business in this judicial district.

26. Venue is proper under 28 U.S.C. § 1391(b)(2) because Defendant's principal place of business is in this district, Defendant conducts business in this district, and a substantial part of the events, acts and omissions which gave rise to these claims occurred in this district.

## COMMON FACTUAL ALLEGATIONS

### A. Federal Regulators Make Clear that the Use of Tracking Technologies to Collect & Divulge Private Information Without Informed Consent Is Illegal

27. Information concerning a person's physical and mental health is among the most confidential and sensitive information in our society and the mishandling of such information can have serious consequences including, but certainly not limited to, discrimination in the workplace and denial of insurance coverage.[6]

---

[6] *See* Lindsey Ellefson, *Telehealth Sites Put Addiction Patient Data at Risk: New research found pervasive use of tracking tech on substance-abuse-focused health care websites, potentially endangering users in a post-Roe world* (Nov. 16, 2022), https://www.wired.com/story/substance-abuse-telehealth-privacy-tracking-tech/ ("While the sharing of any kind of patient information is often strictly regulated or outright forbidden, it's even more verboten in addiction treatment, as patients' medical history can be inherently criminal and stigmatized."); *see also* Todd Feathers, Simon Fondrie-Teitler, Angie Waller & Surya Mattu, *Facebook Is Receiving Sensitive Medical Information from Hospital Websites* (June 16, 2022), https://themarkup.org/pixelhunt/2022/06/16/facebook-is-receiving-sensitive-medical-information-from-hospital-websites.

28. Simply put, if people do not trust that their protected health information will be kept private and secure, they may be less likely to seek medical treatment which can lead to much more serious health consequences down the road. In addition, protecting medical information and making sure it is kept confidential and not disclosed to any unauthorized entities is vitally necessary to maintain public trust in the healthcare system as a whole.

29. Surreptitious collection and divulgence of Private Information is an extremely serious data security and privacy issue. Both the Federal Trade Commission ("FTC") and the Office for Civil Rights ("OCR") of the Department of Health and Human Services ("HHS") have reiterated the importance of and necessity for data security and privacy concerning health information.[7]

30. For instance, the FTC published a bulletin entitled *Protecting the privacy of health information: A baker's dozen takeaways from FTC cases*, in which it noted that "[h]ealth information is not just about medications, procedures, and diagnoses. ***Rather, it is anything that conveys information—or enables an inference—about a consumer's health***. Indeed, [recent FTC enforcement actions involving] *Premom*, *BetterHelp*, *GoodRx* and *Flo Health* ***make clear that the fact that a consumer is using a particular health-related app or website—one related to***

[7] *See, e.g.*, Heather Landi, *Regulators Warn Hospitals and Telehealth Companies about privacy risks of Meta, Google Tracking Tech*, FIERCE HEALTHCARE (July 21, 2023), https://www.fiercehealthcare.com/health-tech/regulators-warn-hospitals-and-telehealth-companies-about-privacy-risks-meta-google (noting that the FTC and the U.S. Department of Health and Human Services' Office for Civil Rights (OCR) issued a rare joint release announcing that 130 hospital systems and telehealth providers received a letter warning them about the data privacy and security risks related to the use of online tracking technologies integrated into their websites or mobile apps).

***mental health or fertility, for example—or how they interact with that app (say, turning 'pregnancy mode' on or off) may itself be health information."***[8]

31. The FTC has been unequivocal in its stance as it informed healthcare companies that they should ***not*** use tracking technologies to collect sensitive health information and disclose it to various platforms without informed consent:

> **Don't use behind-the-scenes tracking technologies that contradict your privacy promises or otherwise harm consumers.**
>
> In today's surveillance economy, the consumer is often the product. Consumer data powers the advertising machine that goes right back to the consumer. ***But when companies use consumers' sensitive health data for marketing and advertising purposes, such as by sending that data to marketing firms via tracking pixels on websites or software development kits on apps, watch out.***
>
> [Recent FTC enforcement actions such as] *BetterHelp*, *GoodRx*, *Premom*, and *Flo* make clear that practices like that ***may run afoul of the FTC Act if they violate privacy promises or if the company fails to get consumers' affirmative express consent for the disclosure of sensitive health information***.[9]

32. The federal government is taking these violations of health data privacy and security seriously as recent high-profile FTC settlements against several telehealth companies evidence. For example, the FTC imposed a $1.5 million penalty on GoodRx for violating the FTC Act by sharing its customers' sensitive PHI with advertising companies and platforms, including

---

[8] *See* Elisa Jillson, *Protecting the privacy of health information: A baker's dozen takeaways from FTC cases,* NYU School of Law Program on Corporate Compliance & Enforcement (Sept. 4, 2023), https://wp.nyu.edu/compliance_enforcement/2023/09/04/protecting-the-privacy-of-health-information-a-bakers-dozen-of-takeaways-from-ftc-cases/ .

[9] *Id.* (emphasis added) (further noting that *GoodRx* & *Premom* underscore that this conduct may also violate the Health Breach Notification Rule, which requires notification to consumers, the FTC and, in some cases, the media, of disclosures of health information without consumers' authorization.)

Facebook, Google and Criteo, and a $7.8 million settlement with the online counseling service BetterHelp, resolving allegations that the company shared customer health data with Facebook and Snapchat for advertising purposes. And Easy Healthcare was ordered to pay a $100,000 civil penalty for violating the Health Breach Notification Rule when its ovulation tracking app Premom shared health data for advertising purposes.[10]

33. In July 2023, federal regulators sent a letter to approximately 130 healthcare providers warning them about using online tracking technologies that could result in unauthorized disclosures of Private Information to third parties. The letter highlighted the "risks and concerns about the use of technologies, such as the Meta/Facebook Pixel and Google Analytics, that can track a user's online activities," and warned about "[i]mpermissible disclosures of an individual's personal health information to third parties" that could "result in a wide range of harms to an individual or others." According to the letter, "[s]uch disclosures can reveal sensitive information including health conditions, diagnoses, medications, medical treatments, frequency of visits to health care professionals, where an individual seeks medical treatment, and more."[11]

---

[10] *See How FTC Enforcement Actions Will Impact Telehealth Data Privacy*, Health IT Security, https://healthitsecurity.com/features/how-ftc-enforcement-actions-will-impact-telehealth-data-privacy (May 2, 2023); *see* Allison Grande, *FTC Targets GoodRx In 1st Action Under Health Breach Rule*, Law360 (Feb. 1, 2023), www.law360.com/articles/1571369/ftc-targets-goodrx-in1st-action-under-health-breach-rule?copied=1 ("The Federal Trade Commission signaled it won't hesitate to wield its full range of enforcement powers when it dinged GoodRx for allegedly sharing sensitive health data with advertisers, teeing up a big year for the agency and boosting efforts to regulate data privacy on a larger scale."); *FTC Gives Final Approval to Order Banning BetterHelp from Sharing Sensitive Health Data for Advertising, Requiring It to Pay $7.8 Million*, FTC (July 14, 2023), https://www.ftc.gov/news-events/news/press-releases/2023/07/ftc-gives-final-approval-order-banning-betterhelp-sharing-sensitive-health-data-advertising; *Ovulation Tracking App Premom Will be Barred from Sharing Health Data for Advertising Under Proposed FTC Order*, FTC (May 17, 2023), https://www.ftc.gov/news-events/news/press-releases/2023/05/ovulation-tracking-app-premom-will-be-barred-sharing-health-data-advertising-under-proposed-ftc.

[11] *Use of Online Tracking Technologies*, HHS OCR (July 20, 2023),

34. Investigative journalists have published several reports detailing the seemingly ubiquitous use of tracking technologies on hospitals', health care providers' and telehealth companies' digital properties to monetize their users' Private Information.

35. For instance, THE MARKUP reported that 33 of the largest 100 hospital systems in the country utilized the Meta Pixel to send Facebook a packet of data whenever a person clicked a button to schedule a doctor's appointment.[12]

36. And, in the aptly titled report *"Out of Control": Dozens of Telehealth Startups Sent Sensitive Health Information to Big Tech Companies*, a joint investigation by STAT and THE MARKUP of 50 direct-to-consumer telehealth companies reported that telehealth companies or virtual care websites were providing sensitive medical information they collect to the world's largest advertising platforms.[13] Many telehealth sites had at least one tracker—from Meta, Google, TikTok, Bing, Snap, Twitter, LinkedIn, or Pinterest—that collected patients' answers to medical intake questions.[14]

---

https://www.hhs.gov/sites/default/files/use-online-tracking-technologies.pdf (last visited Oct. 20, 2026).

[12] *See* Todd Feathers, Simon Fondrie-Teitler, Angie Waller & Surya Mattu, *Facebook is Receiving Sensitive Medical Information from Hospital Websites*, The Markup (June 16, 2022), https://themarkup.org/pixel-hunt/2022/06/16/facebook-is-receiving-sensitive-medical-information-from-hospital-websites.

[13] Todd Feathers, Katie Palmer (STAT) & Simon Fondrie-Teitler, *"Out of Control": Dozens of Telehealth Startups Sent Sensitive Health Information to Big Tech Companies: An investigation by The Markup and STAT found 49 out of 50 telehealth websites sharing health data via Big Tech's tracking tools*, The Markup (Dec. 13, 2022), https://themarkup.org/pixel-hunt/2022/12/13/out-of-control-dozens-of-telehealth-startups-sent-sensitive-health-information-to-big-tech-companies.

[14] *See id.* (noting that "[t]rackers on 25 sites, including those run by industry leaders Hims & Hers, Ro, and Thirty Madison, told at least one big tech platform that the user had added an item like a prescription medication to their cart, or checked out with a subscription for a treatment plan").

37. In the case of Frontier, it appears to have installed tracking pixels, cookies and other invisible codes from at least Google, one of the largest data brokers in the world, on its Website.

## B. Frontier's Use of Third-Party Trackers on its Website

### a. *Google's Mass Advertising Surveillance Operation*

38. Alphabet Inc., the parent holding company of Google, generates revenues primarily by delivering targeted online advertising through Google, which is the creator of the Google Source Code and an established advertising company.

39. Google is the largest digital advertiser in the country, accounting for 26.8-percent of the total digital advertising revenue generated in the United States.[15]

40. In 2023, Google's advertising revenue of $238 billion accounted for 77-percent of its total revenue for the year.[16]

41. Google advertises Google Analytics and other Business Tools to website operators, like Defendant, claiming they will allow the operator to "[u]nderstand [their] site and app users," "check the performance of [their] marketing," and "[g]et insights only Google can give."[17]

---

[15] *Share of major ad-selling companies in digital advertising revenue in the United States*, STATISTA (June 20, 2024), https://www.statista.com/statistics/242549/digital-ad-market-share-of-major-ad-selling-companies-in-the-us-by-revenue/.

[16] Florian Zandt, *Google's Ad Revenue Dwarfs Competitors*, STATISTA (Sept. 10, 2024), https://www.statista.com/chart/33017/annual-advertising-revenue-of-selected-tech-companies-offering-search-solutions/.

[17] *Welcome to Google Analytics*, GOOGLE, https://analytics.google.com/analytics/web/provision/?authuser=0#/provision.

42. But, in order for website operators to get information from Google Analytics about their website's visitors, they must allow data collection through installation of Google's Tracking Technologies on their website.[18]

43. Indeed, on its *Privacy & Terms* page, Google admits that it collects information from third-party websites, stating that "[m]any websites and apps use Google services to improve their content and keep it free. When they integrate our services, these sites and apps share information with Google."[19]

44. Google also admits that it uses the information collected from third-party websites, such as the Website, to sell targeted advertising, explaining to users that, "[f]or example, a website that sells mountain bikes might use Google's ad services. After you visit that site, you could see an ad for mountain bikes on a different site that shows ads served by Google."[20]

45. While Google admits that it collects information from third-party websites through the Tracking Technologies, it does not provide, nor could it provide, a publicly available list of every webpage on which its Tracking Technologies are installed.

46. The vague descriptions of Defendant's data collection practices could not give Plaintiffs and Class Members any reason to think that Defendant was part of Google's surveillance network.

47. Plaintiffs and Class Members could not have been reasonably expected to review any of Google's privacy statements in connection with their use of the Website.

---

[18] *See* Aaron Ankin & Surya Mattu, *The High Privacy Cost of a "Free" Website*, THE MARKUP, https://themarkup.org/blacklight/2020/09/22/blacklight-tracking-advertisers-digital-privacy-sensitive-websites.

[19] *Privacy & Terms – How Google uses information from sites or apps that use our services*, GOOGLE, https://policies.google.com/technologies/partner-sites.

[20] *Id.*

48. Google aggregates the user information that it collects from third-party websites into "advertising profiles" consisting of all of the data that it has collected about a given user.[21]

49. With these advertising profiles, Google can sell hyper-precise advertising services, allowing its clients to target internet users based on combinations of their location, age, race, interests, hobbies, life events (e.g., recent marriages, graduation, or relocation), political affiliation, education level, home ownership status, marital status, household income, type of employment, use of specific apps or websites, and more.[22]

50. Google's surveillance of individuals' internet usage is ubiquitous. In 2017, Scientific American reported that over 70-percent of smartphone apps report "personal data to third-party tracking companies like Google,"[23] and Google trackers are present on 74-percent of all web traffic.

51. Moreover, as in this case, the data collected by Google often pertains to the most personal and sensitive aspects of an individual's life. For example:

a. Twelve of the largest pharmacy providers in the United States send information regarding users' purchases of products such as pregnancy tests, HIV tests, prenatal vitamins, and Plan B to online advertisers.[24] For example, when an online shopper

---

[21] Bennett Cyphers & Gennie Gebhart, *Behind the One-Way Mirror: A Deep Dive Into the Technology of Corporate Surveillance*, ELECTRONIC FRONTIER FOUNDATION (2019), *available online at*: https://www.eff.org/files/2019/12/11/behind_the_one-way_mirror-a_deep_dive_into_the_technology_of_corporate_surveillance_0.pdf.

[22] *About audience segments*, GOOGLE ADS, https://support.google.com/google-ads/answer/2497941?hl=en#zippy=%2Cin-market-segments%2Caffinity-segments%2Clife-events%2Cdetailed-demographics.

[23] Narseo Vallina-Rodriguez & Srikanth Sundaresan*, 7 in 10 Smartphone Apps Share Your Data with Third-Party Services*, SCIENTIFIC AMERICAN (May 30, 2017), https://www.scientificamerican.com/article/7-in-10-smartphone-apps-share-your-data-with-third-party-services/.

[24] Darius Tahir & Simon Fondrie-Teitler*, Need to Get Plan B or an HIV Test Online? Facebook May Know About It*, THE MARKUP (June 30, 2023), https://themarkup.org/pixel-hunt/2023/06/30/need-to-get-plan-b-or-an-hiv-test-online-facebook-may-know-about-it.

searches for a pregnancy test, views the product page for a pregnancy test, or adds a pregnancy test to their online shopping cart on Kroger's website, that information is transmitted to Google.[25]

b. 81-percent of the most popular mobile apps for managing depression and quitting smoking allowed Facebook and/or Google to access subscriber information, including health diary entries and self-reports about substance abuse.[26]

52. This monumental, invasive surveillance of Americans' internet usage and resulting violation of their privacy is not accidental. As Google's then-CEO, Eric Schmidt, admitted in 2010: "We know where you are. We know where you've been. We can more or less know what you're thinking about."[27]

53. In fact, Google values user information so highly that it provides its Business Tools to many website operators for free, all to expand its surveillance apparatus.[28]

54. When website operators, like Defendant, make use of Google's Business Tools, they are essentially choosing to participate in Google's mass surveillance network and, in return, they benefit from Google's collection of user data at the expense of their website users' privacy.

55. For example, Google rewards website operators for providing it with user information by granting such website operators access to its Analytics platform, which then

---

[25] Jon Keegan, *Forget Milk and Eggs: Supermarkets Are Having a Fire Sale on Data About You*, THE MARKUP (Feb. 16, 2023), https://themarkup.org/privacy/2023/02/16/forget-milk-and-eggs-supermarkets-are-having-a-fire-sale-on-data-about-you.

[26] Kit Huckvale, John Torous & Mark E. Larsen, *Assessment of the Data Sharing and Privacy Practices of Smartphone Apps for Depression and Smoking Cessation*, JAMA NETWORK OPEN (2019), *available online at*: https://pubmed.ncbi.nlm.nih.gov/31002321/.

[27] Andrew Orlowski, *Google's Schmidt: We know what you're thinking*, THE REGISTER (Oct. 4, 2010), https://www.theregister.com/2010/10/04/google_ericisms/.

[28] *Analytics Overview*, GOOGLE, https://marketingplatform.google.com/about/analytics/ ("Google Analytics gives you the tools, free of charge").

leverages demographic data collected by Google to provide detailed analyses of the website's user base.[29]

56. Unfortunately, it is usually the case that a website operator's use of third-party tracking software is not disclosed whatsoever in its privacy policy.[30]

57. And even where the use of such third-party software is disclosed, such disclosures are often hidden and cloaked in such confusing, technical and overly legal language as to be indecipherable to the typical internet user.[31]

58. Moreover, for even a conscientious internet user, the massive volume of privacy policies encountered through routine internet use makes reviewing each and every one practically impossible. According to one study, it would take the average internet user 244 hours—or 30.5 working days—to read the privacy policy of every new website that they visited in a single year.[32]

***b. Google Tracking Technologies***

59. Google Source Code—the source code associated with Google's advertising system and products, including Google Analytics—is designed to track and collect individuals' information when they are browsing the internet.

---

[29] *Google Marketing Platform – Features*, GOOGLE, https://marketingplatform.google.com/about/analytics/features.

[30] *See* Woodrow Hartzog, *Privacy's Blueprint*, 60-67 (Harvard University Press 2018) (detailing deficiencies with online privacy policies).

[31] *Id.*

[32] Aleecia M. McDonald & Lorrie Faith Cranor, *The Cost of Reading Privacy Policies*, I/S: A JOURNAL OF LAW AND POLICY FOR THE INFORMATION SOCIETY (2008), *available online at*: https://lorrie.cranor.org/pubs/readingPolicyCost-authorDraft.pdf.

60. Google Source Code is provided by Google in a copy-and-paste format, and its functionality is uniform on all web properties, with the option for website operators like Frontier to choose to disclose additional data about its users to Google. Its operation is hidden by Google's design and does not indicate to users that Google Source Code is present on a website they are visiting.

61. When the Google Source Code is placed by website operators such as Frontier on their digital properties, Frontier's actions allow the Google Source Code to instruct the computer accessing Frontier's web pages to track, intercept, and redirect the user's information to Google.

62. This tracking, interception, and redirection of information occurs when individuals exchange communications or requests with the relevant web pages.

63. Google Analytics, a marketing tool used for advertising and analytics, is one of Google's primary products and services that leverage Google Source Code to track, collect, and subsequently use (i.e., monetize) individuals' personal information. A fundamental and primary purpose of Google Analytics is to obtain information about consumers' communications and activities that is accessible by entities other than Google. Google accomplishes this through Google Analytics, in part, by touting it as a tool that enables clients to "understand the customer journey and improve marketing ROI."[33] Specifically, according to Google, Google Analytics is intended to help advertisers:

a. "Unlock customer-centric measurement" to "[u]nderstand how your customers interact across your sites and apps, throughout their entire lifecycle;"

b. "Get smarter insights to improve ROI," to "[u]ncover new insights and anticipate future customer actions with Google's machine learning to get more value out of your data;" and

---

[33] Google Marketing Platform, *Analytics*, https://marketingplatform.google.com/about/analytics/

c. "Connect your insights to results," to "[t]ake action to optimize marketing performance with integrations across Google's advertising and publisher tools[.]"[34]

64. When a user exchanges information with the host of a website—such as through a search query—Google Source Code operates to surreptitiously direct the user's browser to send a separate message to Google's servers. This second, secret transmission contains the original request sent to the host website, ("GET request"), along with additional data that the Google Source Code is configured to collect ("POST request"). These transmissions are initiated by Google Source Code and concurrent with the communications to and from the host website.

65. Google Analytics offers website developers like Frontier the option to include additional data of their own choosing about its users' activities in any communications to Google, including enabling Google click tracking and custom event data. As can be seen from the Google Analytics developer website, this data is optional and not sent to Google by default.[35]

66. Plaintiffs' counsel's research shows that Defendant enabled such additional data collection from its patients, including tracking of such custom events as "Medical Button," "patient_portal_button," "call_btn," schedule clicks for various Frontier locations, "booknow_location," "schedule_appt_location," and others. In other words, Frontier took affirmative, additional steps of its own to configure Google Analytics to ensure that Google received additional data about its patients who used the Website.

67. Google associates the information it obtains via Google Source Code with other information regarding the user, using personal identifiers that are transmitted concurrently with

---

[34] *Id.*

[35] *See* Google Analytics, *Measurement Protocol Parameter Reference*, https://web.archive.org/web/20240602064446/https://developers.google.com/analytics/devguides/collection/protocol/v1/parameters.

other information the code is configured to collect. These identifiers include the “cid,” a combination of the first time at which the user visited the website and a unique identifier. The “cid” is assigned to an individual’s browser and can persist for up to two years, allowing Google to link a series of events to the same browser and, thus, to an individual. It’s incorporated into a persistent _ga cookie which tracks user activity across sessions for up to two years. For Google account holders, this identifier is also linked to that account.

68. Google also uses DoubleClick cookies, including DSID and IDE, that operate as a unique ID for the user in question, to track unique users across websites and target them with ads based on their browsing activities. Frontier installed DoubleClick on the Website.

69. In addition to information gleaned from a user’s unique ID, Google can create a unique, digital “fingerprint” for a user based on data transmitted via Google Source Code, which allows Google to link certain web activity to a user. This “fingerprint” can consist of information regarding a user’s screen depth, screen resolution, browser name and version, and operating system name and version, as well as a user’s Internet Protocol (“IP”) address. With that information, Google is able to link data acquired through Google Analytics to a particular user.[36]

70. When a Google user logs onto their account, their web browser records a Google tracking cookie.[37] This cookie includes a specific line of code that links the web browser to the user’s Google account.[38]

---

[36] In 2017, researchers demonstrated that browser fingerprinting techniques can successfully identify 99.24 percent of all users. *See* https://www.ndss-symposium.org/ndss2017/ndss-2017-programme/cross-browser-fingerprinting-os-and-hardware-level-features/.

[37] Cyphers, *supra*, n.21.

[38] *Id.*

71. A remarkable number of Americans possess a Google account. Just one of Google's many products, its Gmail e-mail client, is used by over one-third of Americans.[39] When these users visit a website that utilizes Google tracking codes (like Defendant's), any information collected by these trackers can be linked to the user's identity through the Google cookies installed on the user's web browser.

72. However, it is not only Google account holders that are at risk of having collected website data linked to their identities. Rather, Google utilizes sophisticated data tracking methods to identify even those few users who do not have a Google account.[40]

73. Google's Tracking Technologies, like those on the Website, can acquire information about the user's device and browser, such as their screen resolution, time zone setting, browser software type and version, operating system type and version, language setting, and IP address.

74. An internet user's combination of such device and browser characteristics, commonly referred to as their "browser fingerprint," is "often unique."[41] By tracking this browser fingerprint, Google is able to compile a user's activity across the internet.[42] And, as Google continuously compiles user data over time, its understanding of the user's browser fingerprint

---

[39] *See* Harsha Kiran, *49 Gmail Statistics To Show How Big It Is In 2024*, TECHJURY (Jan. 3, 2024), https://techjury.net/blog/gmail-statistics/ ("Gmail accounts for 130.9 million of the total email users in the US"). The United States population is approximately 337.4 million. *See* UNITED STATES CENSUS BUREAU, https://www.census.gov/popclock/.

[40] *See Client ID vs User ID in Google* Analytics, GLIDE AD AGENCY, https://glideagency.com/client-id-vs-user-id-in-google-analytics/.

[41] Cyphers, *supra*, n.21.

[42] *Id.*

becomes more sophisticated such that it needs only to collect a single piece of identifying information to identify the user linked to a browser fingerprint.

75. Browser-fingerprints are also considered personal identifiers, and tracking codes can collect browser-fingerprints from website visitors. Browser-fingerprints are protected personal identifiers under HIPAA. *See* 45 C.F.R. § 164.514(b)(2)(i)(M), (R).

76. After tracking, intercepting, and acquiring users' information, Google uses the information for personalized advertising in its advertising systems which includes, but is not limited to, Google Analytics.

77. For example, Google Analytics uses the information it collects to facilitate its Audience Targeting feature. Audience Targeting refers to serving ads to only a select number of users who share certain common characteristics. For Google's Audience Targeting, Google can target ads to either "Pre-defined Google Audiences" or "Advertiser-curated Audiences." Pre-defined Audiences are those created by Google based on interest and demographic data. Advertiser-curated Audiences are customized audiences created by Google through the use of the Source Code, including audiences created through Google Analytics.

78. Google is therefore able to monetize the information surreptitiously intercepted, with Frontier's help, from visitors to the Frontier Website.

**C. Frontier Assisted Unauthorized Third Parties in Intercepting Patients' Communications with its Website and Disclosed Their Private Information to Unauthorized Third Parties.**

79. Defendant encouraged patients to use its Website to communicate their Private Information, review information on their skin conditions, look up dermatologists, schedule appointments, access information about their treatments, pay medical bills and more.

80. Despite this, Defendant purposely installed Tracking Technologies including, but likely not limited to, Google Analytics and Google Ads trackers including DoubleClick cookies on its Website and programmed specific webpage(s) and screens to surreptitiously share its patients' private and protected communications, including Plaintiffs' and Class Members' PHI and/or PII, which was sent to Google and likely other third parties.

81. The Tracking Technologies followed, recorded, and disseminated patients' information as they navigated and communicated with Defendant via the Website, simultaneously transmitting the substance of those communications to unauthorized third parties.

82. The information disseminated by the Tracking Technologies and intercepted by third parties constitutes Private Information, including dermatological information patients requested or viewed and the condition, doctors, and clinic location pages visited, together with the fact that the patient was scheduling an appointment, the divulgence of which is and was highly offensive to Plaintiffs and Class Members.

83. The information collected and disclosed by Defendant's Tracking Technologies is not anonymous and is viewed and categorized by the intercepting party upon receipt.

84. Through its Tracking Technologies, Google stores users' logged-in identifiers on non-Google websites in its logs. Whenever a user logs-in on non-Google websites, whether in private browsing mode or non-private browsing mode, the same identifier is associated with the data Google collects from the user's browsing activities on that website. Google further logs all such data (private and non-private) within the same logs and uses these data for serving personalized ads.

85. The health information that was disclosed via the Tracking Technologies is personally identifiable and was sent alongside other persistent unique identifiers such as the patients' IP address, their unique Google IDs, and device identifiers.[43]

**D. Defendant's Tracking Technologies Disseminate Patients' Information from Defendant's Website.**

86. If a patient uses Defendant's Website to find dermatological care, the Website directs them to communicate Private Information, including but not limited to the reason (i.e. the specific skin condition), the identity and board credentials of the provider whose profile is opened, sought location for the visit, the fact that they are scheduling an appointment, and their status as medical patients.

87. Unbeknownst to the patient, these communications are sent to Google (and likely other third-party entities) via Defendant's Tracking Technologies.

88. Defendant discloses these searches and selections by its patients and prospective patients to Google and other unauthorized third parties, as illustrated in the examples below which show the "behind the scenes" portion of the Website that is invisible to ordinary users.

*Figure 1: Screenshot from the Frontier Website depicting a webpage as seen by patients:*

[43] *See Brown v. Google LLC*, 525 F. Supp. 3d 1049, 1056 (N.D. Cal. 2021) (discussing how Google collects personal information and IP addresses); *see also* https://developers.facebook.com/docs/meta-pixel/.


https://www.frontierdermatology.com/acne/

FRONTIER DERMATOLOGY

(360) 243-5167

Medical Cosmetic

Acne

*At Frontier Dermatology, your skin health is our top priority. We offer expert cosmetic, medical, and surgical dermatology services through more than 100+ experienced providers across 40+ locations in Washington and Oregon. Serving patients throughout the Pacific Northwest, including Portland, Tacoma, Vancouver, Seattle, and surrounding communities, our board-certified dermatologists and aesthetic specialists provide advanced treatments for skin health, anti-aging, acne, skin rejuvenation, injectables, laser treatments, and more. Our goal is to deliver personalized dermatology care and cosmetic treatments that help patients look and feel their best.*

Schedule an Appointment

-- Select a Location --

*Figures 2-4. Examples of searches for and selections of Frontier's services related to their skin conditions along with the users' unique personal identifiers from Google, the CID, AUID, IDE, and DSID cookies:*


data:text/javascrip...
data:text/javascrip...
recaptcha__en.js
11375742770/?random=17...
11375742770/?random=17...
js?id=G-7Q0ZTV2PSN&cx...
collect?rcb=13&frm=0&aui...
widget_app_base_178342...
loader.js
collect?rcb=2&frm=0&ae=...
collect?v=2&tid=G-C8C93...
11375742770/?random=17...
anchor?ar=1&k=6Ldaw7Yr...
call-tracking_9.js
bHaMyRK3Gu
wcm?cc=ZZ&dn=3602435...
wcm?cc=ZZ&dn=3602435...
styles__ltr.css
recaptcha__en.js
data:image/png;base...
data:image/png;base...
logo_48.png
KFO7CnqEu92Fr1ME7kSn6...
webworker.js?hl=en&v=A...
remediation_17834210287...
widget_base.css?v=17834...
widget_base.css?v=17834...
recaptcha__en.js
wheel_right_wh.svg
spin_wh.svg
bframe?hl=en&v=A7KpaEA...
styles__ltr.css
dma 0
_eu AAAAACQC
cid 1710359538.1785076294
frm 0
ibt 1
ngs 1
pscdl noapi
rcb 13
sr 1470x956
uaa arm
uab 64
uafvl Not%3BA%3DBrand;8.0.0.0|Chromium;150.0.7871.125|Google%20Ch
71.125
uam
uamb 0
uap macOS
uapv 12.5.0
uaw 0
ul en-us
_s 1
tag_exp 115938466~115938469~118897920~118897930~119896803
sid 1785323212
sct 2
dl https://www.frontierdermatology.com/acne/
dr https://www.frontierdermatology.com/
dt Acne Washington | Oregon Acne
en page_view
tfd 3832


data:text/javascrip...
recaptcha__en.js
11375742770/?random=17...
11375742770/?random=17...
js?id=G-7Q0ZTV2PSN&cx...
collect?rcb=13&frm=0&aui...
widget_app_base_178342...
loader.js
collect?rcb=2&frm=0&ae=...
collect?v=2&tid=G-C8C93...
11375742770/?random=17...
anchor?ar=1&k=6Ldaw7Yr...
rcb 13
tiba Acne Washington | Oregon Acne
hn www.googleadservices.com
npa 0
auid 1591550548.1785076294
uab 64
uafvl Not%3BA%3DBrand;8.0.0.0|Chromium;150.0.7871.125|Google%20Chrome;150.0.78
71.125





89. In each of the examples above, the user's Website activity and the contents of their communications are sent to Google alongside their PII. Marketers such as Google are able to personally identify individual Website users through several means, but the examples above demonstrate how the Website user's identity is revealed via Google's third-party cookies that work in conjunction with the Tracking Technologies.

90. Google Analytics uses both first- and third-party cookies, and both were used on the Website.[44]

91. Frontier embedded Google Tracking Technologies on the Website, which intercepted and recorded "click" events, among other categories of user data. "Click" events detail information about which page on the Website the user was viewing as well as the selections they were making.

92. These interceptions also included Google first- and third-party cookies, which Google utilizes to identify its account holders for targeted advertising.

93. Utilizing the Tracking Technologies, Frontier collected and disclosed sensitive PII and PHI from its Website users, including the fact that the user was proceeding to make appointments, their dermatological reason for booking the appointment, and their preferred provider.

---

[44] A first-party cookie is "created by the website the user is visiting"—in this case, Defendant's Website. A third-party cookie is "created by a website with a domain name other than the one the user is currently visiting"—i.e., Google. The CID (Client ID) cookie is transmitted as a first-party cookie. At a minimum, Google uses the CID, _ga, DSID and IDE cookies to link website visitors' data to their corresponding Google accounts.

94. The figure below illustrates this conduct:




95. These transmissions disclosed, in combination, that the patient was (i) seeking dermatological care from Frontier, (ii) at a specific Frontier location, and (iii) for a specific skin reason—all alongside persistent Google identifiers that Google uses to match Website visitors to their specific Google accounts.

96. Therefore, Defendant intercepted its patients' and potential patients' Private Information including details of their dermatological appointments and transmitted this health information to Google, and likely other unauthorized third parties, without their consent.

97. Defendant does not disclose that Google Analytics or any other Tracking Technologies embedded in the Website's Source Code track, record, and transmit Plaintiffs' and Class Members' Private Information to Google. Moreover, Defendant never received consent or written authorization to disclose Plaintiffs' and Class Members' private communications to Google.

**E. Defendant's Conduct Is Unlawful and Violated Its Own Privacy Policy and Industry Norms.**

***i. Defendant Violated Its Own Privacy Policy.***

98. Defendant's privacy policies made several specific, affirmative promises that, taken together, foreclose any "we disclosed data collection and sharing" defense. None of these promises was qualified by any disclosure that Frontier would transmit users' PII or PHI to Google or other third-party data brokers for advertising and marketing purposes, without the users' consent.

99. First, Defendant's Privacy Policy effective November 27, 2024 stated, "Frontier Dermatology values your privacy and is committed to protecting your personal information."

100. Second, the Policy stated:[45]

**Your information is used for the following purposes:**

- To provide, maintain, and improve our services.
- To communicate updates, promotions, or other relevant information with your consent.
- To analyze user behavior and improve website functionality.

**We may disclose information only:**

- When required by law or legal process.
- To protect the rights, property, or safety of our company, users, or others.

---

45 *See* https://web.archive.org/web/20260503194400/https://www.frontierdermatology.com/privacy-policy-2/

101. None of these conditions apply here.

102. Third, Defendant's Privacy Policy is clear that Frontier does "not sell, share, or distribute your information to third parties for marketing purposes without your explicit consent."[46]

103. Fourth, Defendant's Privacy Policy further promises that "[y]our privacy is our priority!"[47]

104. In or around May 2026—after Plaintiffs began visiting the Website—Defendant revised its Privacy Policy.[48] The new version also states that Frontier does not sell patients' information, and specifically tells patients that "[w]here PHI is involved, we do not disclose it to a tracking-technology vendor unless that vendor has signed a business associate agreement with us and the disclosure is otherwise permitted under the HIPAA Privacy Rule. Where we use analytics or advertising platforms that are not business associates, any information sent to them is de-identified or limited to non-PHI data before it leaves our systems."[49]

105. Frontier also admits that its "Cookie Policy Does Not Cover HIPAA Authorization": "Accepting cookies through the banner in Part A manages your consent for tracking-technology purposes under general privacy and consumer-protection law only. It is not, and does not substitute for, a HIPAA authorization. We do not treat your cookie-banner response as authorizing the disclosure of protected health information to any vendor. A disclosure of protected health information requires either a signed business associate agreement with the vendor

---

[46] *Id.*

[47] *Id.*

[48] *See* https://www.frontierdermatology.com/privacy-policy/ (last visited Oct. 20, 2026)

[49] *Id.*

and an applicable HIPAA Privacy Rule permission, or your separate, HIPAA-compliant written authorization." [50]

106. This updated Privacy Policy includes a disclosure of Defendant's use of third-party cookies, including from Google Analytics, Google Ads and Meta Ads, but specifies that their use requires user consent:

| | | | |
|---|---|---|---|
| Analytics | Google Analytics | Collects aggregate information about how visitors use the Site. See Google's disclosure at policies.google.com/technologies/partner-sites. | Requires consent |
| Advertising | Google Ads | Measures ad effectiveness and, where enabled, personalizes ads. See policies.google.com/technologies/partner-sites. | Requires consent |
| Advertising | Meta Ads (Facebook/Instagram) | Measures ad effectiveness and, where enabled, personalizes ads across Meta platforms. See facebook.com/privacy/policies/cookies. | Requires consent |

107. Frontier further represents that "[e]ach third-party provider listed above is contractually bound to a data processing agreement restricting its use of information collected through the Site to the purpose described. For any vendor that could receive protected health information (for example, through data tied to an appointment or symptom-related inquiry), we additionally require a signed business associate agreement before any such disclosure." [51]

108. Upon information and good faith belief, Frontier does ***not*** have a business associate agreement with Google (or Facebook) and these data brokers will not, in fact, sign one in the context of a customer using their tracking codes in any way that may create obligations under HIPAA for them – because Google Analytics and the Meta Pixel are not HIPAA-compliant.[52]

---

[50] *Id.*

[51] *Id.*

[52] *See* Google Analytics Help, *HIPAA and Google Analytics*, https://support.google.com/analytics/answer/13297105?hl=en; PatientGain, *Healthcare Marketing With HIPAA Compliant Google Analytics*, https://www.patientgain.com/healthcare-marketing-with-hipaa-compliant-google-analytics; Curve, *Does Google Analytics 4 Sign a BAA?*, https://www.curvecompliance.com/baa-registry/google-analytics-4; Paubox, *Can I use Google Analytics on a telehealth site?*, https://www.paubox.com/blog/can-i-use-google-analytics-on-a-telehealth-site; datatrue, *Is Google Analytics HIPAA Compliant*,

109. Defendant violated its own privacy policies by unlawfully disclosing Plaintiffs' and Class Members' Private Information to Google and likely other third parties such as Facebook without written authorization.

110. Defendant's Privacy Policy also represents that users could opt out of "non-essential" cookies but goes on to say that this may affect the Website's functionality.[53] This left Plaintiffs and Class Members with no meaningful choice but to subject themselves to invasive tracking and data collection practices, which undermines the very premise of anonymity promised in the Privacy Policy.

111. Defendant's claim that users could manage cookies and tracking technologies on their own devices shifts the burden of privacy protection to consumers rather than fulfilling Defendant's obligation to safeguard sensitive information. This is particularly egregious given that Defendant is a healthcare provider entrusted with the protected health information of Plaintiffs and Class Members, information that is safeguarded under HIPAA and should not be disclosed to third parties for marketing purposes without explicit consent.

112. At no point did Frontier seek authorization from Plaintiffs before transmitting protected health information to a third party for marketing purposes.

---

https://datatrue.com/en/resources/privacy-compliance/is-google-analytics-hipaa-compliant/; https://www.freshpaint.io/blog/how-to-make-facebook-ads-hipaa-compliant-and-still-get-conversion-tracking; https://www.patientgain.com/meta-leads-center-hipaa-compliant.

[53] *Supra note 48.*

***ii. Defendant Violated HIPAA Standards.***

113. Under HIPAA, a healthcare provider may not disclose personally identifiable, non-public medical information about a patient, a potential patient or household member of a patient for marketing purposes without the patient's express written authorization.[54]

114. The HIPAA Privacy Rule "establishes national standards to protect individuals' medical records and other individually identifiable health information (collectively defined as 'protected health information') and applies to health plans, health care clearinghouses, and those health care providers that conduct certain health care transactions electronically."[55]

115. The Privacy Rule broadly defines "protected health information" ("PHI") as individually identifiable health information ("IIHI") that is "transmitted by electronic media; maintained in electronic media; or transmitted or maintained in any other form or medium." 45 C.F.R. § 160.103.

116. IIHI is defined as "a subset of health information, including demographic information collected from an individual" that is: (1) "created or received by a health care provider, health plan, employer, or health care clearinghouse"; (2) "[r]elates to the past, present, or future physical or mental health or condition of an individual; the provision of health care to an individual; or the past, present, or future payment for the provision of health care to an individual"; and (3) either (a) "identifies the individual" or (b) "[w]ith respect to which there is a reasonable basis to believe the information can be used to identify the individual." 45 C.F.R. § 160.103.

117. Under the HIPAA de-identification rule, "health information is not individually identifiable health information only if": (1) an expert "determines that the risk is very small that

[54] HIPAA, 42 U.S.C. § 1320d-6; 45 C.F.R. §§ 164.502, 164.508(a)(3), 164.514(b)(2)(i).

[55] *HIPAA For Professionals*, https://www.hhs.gov/hipaa/for-professionals/index.html.

the information could be used, alone or in combination with other reasonably available information, by an anticipated recipient to identify an individual who is a subject of the information" and "documents the methods and results of the analysis that justify such determination"; or (2) "the following identifiers of the individual or of relatives, employers, or household members of the individual are removed":

> A. Names;
>
> ….
>
> H. Medical record numbers;
>
> ….
>
> J. Account numbers;
>
> ….
>
> M. Device identifiers and serial numbers;
>
> N. Web Universal Resource Locators (URLs);
>
> O. Internet Protocol (IP) address numbers; … and
>
> R. Any other unique identifying number, characteristic, or code…; and
>
> The covered entity must not "have actual knowledge that the information could be used alone or in combination with other information to identify an individual who is a subject of the information."[56]

118. The HIPAA Privacy Rule requires any "covered entity"—which includes health care providers—to maintain appropriate safeguards to protect the privacy of protected health information and sets limits and conditions on the uses and disclosures that may be made of protected health information without authorization. 45 C.F.R. §§ 160.103, 164.502.

119. An individual or corporation violates HIPAA if it knowingly and in violation of 42 U.S.C. §§ 1320d-1320d-9 ("Part C"): "(1) uses or causes to be used a unique health identifier; [or] (2) obtains individually identifiable health information relating to an individual." The statute states

[56] 45 C.F.R. § 164.514(b).

that a "person … shall be considered to have obtained or disclosed individually identifiable health information in violation of [Part C] if the information is maintained by a covered entity … and the individual obtained or disclosed such information without authorization." 42 U.S.C. § 1320d-6.

120. The criminal and civil penalties imposed by 42 U.S.C. § 1320d-6 apply directly to Defendant when it is knowingly disclosing individually identifiable health information relating to an individual, as those terms are defined under HIPAA.

121. Violation of 42 U.S.C. § 1320d-6 is subject to criminal penalties.[57] There is a penalty enhancement where "the offense is committed with intent to sell, transfer, or use individually identifiable health information for commercial advantage, personal gain, or malicious harm." In such cases, the entity that knowingly obtains individually identifiable health information relating to an individual shall "be fined not more than $250,000, imprisoned not more than 10 years, or both."

122. In its *Guidance regarding Methods for De-identification of Protected Health Information in Accordance with the Health Insurance Portability and Accountability Act Privacy Rule*, HHS instructs:

> Identifying information alone, such as personal names, residential addresses, or phone numbers, would not necessarily be designated as PHI. For instance, if such information was reported as part of a publicly accessible data source, such as a phone book, then this information would not be PHI because it is not related to health data… If such information was listed with health condition, health care provision, or payment data, such as an indication that the individual was treated at a certain clinic, then this information would be PHI.[58]

---

[57] 42 U.S.C. § 1320d-6(b).

[58] https://www.hhs.gov/sites/default/files/ocr/privacy/hipaa/understanding/coveredentities/De-identification/hhs_deid_guidance.pdf (emphasis added).

123. In its guidance for marketing, HHS further instructs:

> The HIPAA Privacy Rule gives individuals important controls over whether and how their protected health information is used and disclosed for marketing purposes. With limited exceptions, the Rule requires an individual's written authorization before a use or disclosure of his or her protected health information can be made for marketing. … Simply put, a covered entity may not sell protected health information to a business associate or any other third party for that party's own purposes. Moreover, *covered entities may not sell lists of patients to third parties without obtaining authorization from each person on the list*.[59]

124. Companies have started to warn about the potential HIPAA violations associated with using pixels and tracking technologies because many such trackers are not HIPAA-compliant or are only HIPAA-compliant if certain steps are taken.[60]

125. Medico Digital also warns that "retargeting requires sensitivity, logic and intricate handling. When done well, it can be a highly effective digital marketing tool. But when done badly, it could have serious consequences."[61]

126. As such, Defendant's actions violated HIPAA.

**F. Plaintiffs' and Class Members' Reasonable Expectation of Privacy.**

127. Plaintiffs and Class Members were aware of Defendant's duty of confidentiality when they sought medical services from Defendant.

---

[59] https://www.hhs.gov/sites/default/files/ocr/privacy/hipaa/understanding/coveredentities/marketing.pdf.

[60] *See The guide to HIPAA compliance in analytics*, https://campaign.piwik.pro/wpcontent/uploads/2023/10/The-guide-to-HIPAA-compliance-in-analytics.pdf (explaining that Google Analytics 4 is not HIPAA-compliant).

[61] The complex world of healthcare retargeting (July 10, 2023), https://www.medicodigital.com/the-complicated-world-of-healthcare-retargeting.

128. Indeed, at all times when Plaintiffs and Class Members provided their Private Information to Defendant, they each had a reasonable expectation that the information would remain private and that Defendant would not share the Private Information with third parties for a commercial purpose, unrelated to patient care.

129. Privacy polls and studies show that the overwhelming majority of Americans consider obtaining an individual's affirmative consent before a company collects and shares its customers' data to be one of the most important privacy rights.

130. For example, a Consumer Reports study shows that 92% of Americans believe that internet companies and websites should be required to obtain consent before selling or sharing consumer data, and the same percentage believe those companies and websites should be required to provide consumers with a complete list of the data that is collected about them.[62]

131. Personal data privacy and obtaining consent to share Private Information are material to Plaintiffs and Class Members.

132. Plaintiffs and Class Members would not have used Defendant's Website, would not have provided their Private Information to Defendant and would not have paid for Defendant's healthcare services or would have paid less for them, had they known that Defendant would disclose their Private Information to third parties.

133. Plaintiffs' and Class Members' reasonable expectations of privacy in their PII/PHI are grounded in, among other things, Defendant's status as a healthcare provider, Defendant's common law obligation to maintain the confidentiality of patients' PII/PHI, state and federal laws protecting the confidentiality of medical information, state and federal laws protecting the

[62] *Consumers Less Confident About Healthcare, Data Privacy, and Car Safety, New Survey Finds*, (May 11, 2017), https://www.consumerreports.org/consumer-reports/consumers-less-confident-about-healthcare-data-privacy-and-car-safety-a3980496907/.

confidentiality of communications and computer data, state laws prohibiting the unauthorized use and disclosure of personal means of identification and Defendant's express and implied promises of confidentiality.

### G. Frontier Was Enriched and Benefitted from the Use of the Tracking Technologies and Unauthorized Disclosures.

134. One of the primary reasons that Defendant decided to embed the pixels and other Tracking Technologies on its Website was to commit criminal and tortious acts in violation of federal and state laws as alleged herein, namely, the use of patient data in the absence of express written consent.

135. In exchange for disclosing the Private Information of its patients, Defendant is compensated by Google and likely other third parties in the form of enhanced advertising services and more cost-efficient marketing.

136. Retargeting is a form of online marketing that targets users with ads based on their previous Internet communications and interactions.

137. The process of increasing conversions and retargeting occurs in the healthcare context by sending a successful action on a health care website back to Google via the Tracking Technologies embedded on, in this case, Defendant's Website.

138. For example, when a user searches for a Frontier location on the Website, that information is sent to Google. Google can then use its data on the user to find more users to click on a Frontier ad and ensure that the users targeted are more likely to convert.[63]

---

[63] *See How to Make Facebook Ads HIPAA Compliant and Still Get Conversion Tracking* (Mar. 14, 2023), https://www.freshpaint.io/blog/how-to-make-facebook-ads-hipaa-compliant-and-still-get-conversion-tracking.

139. Through this process, the Tracking Technologies load and capture as much data as possible when a user loads a healthcare website that has installed the Tracking Technologies. The information the Tracking Technologies capture "includes URL names of pages visited, and actions taken—all of which could be potential examples of health information."[64]

140. As part of its marketing campaign, Defendant re-targeted patients and potential patients to get more visitors to its Website to use its services. Defendant did so through use of the intercepted patient data it obtained, procured, and disclosed in the absence of express written consent.

141. Plaintiffs' and Class Members' Private Information has considerable value as highly monetizable data especially insofar as it allows companies to gain insight into their customers so that they can perform targeted advertising and boost their revenues.

142. Professor Paul M. Schwartz, writing in the Harvard Law Review, notes: "Personal information is an important currency in the new millennium. The monetary value of personal data is large and still growing, and corporate America is moving quickly to profit from the trend. Companies view this information as a corporate asset and have invested heavily in software that facilitates the collection of consumer information."[65]

143. Various reports have been conducted to identify the value of health data. For example, in 2023, the Value Examiner published a report entitled Valuing Healthcare Data. The report focused on the rise in providers, software firms and other companies that are increasingly seeking to acquire clinical patient data from healthcare organizations. The report cautioned

---

[64] *Id.*

[65] Paul M. Schwartz, *Property, Privacy, and Personal Data*, 117 Harv. L. Rev. 2055, 2056-57 (2004).

providers that they must de-identify data and that purchasers and sellers of "such data should ensure it is priced at fair market value to mitigate any regulatory risk."[66]

144. Trustwave Global Security also published a report entitled The Value of Data. With respect to healthcare data records, the report found that they may be valued at up to $250 per record on the black market, compared to $5.40 for the next highest value record (a payment card).[67]

145. The value of health data has also been reported extensively in the media. For example, CNBC published an article in 2019 in which it observed that "[d]e-identified patient data has become its own small economy: There's a whole market of brokers who compile the data from providers and other health-care organizations and sell it to buyers."[68]

146. Similarly, Time Magazine published an article in 2017 titled "How Your Medical Data Fuels a Hidden Multi-Billion Dollar Industry" in which it described the extensive market for health data and observed that the market for information was both lucrative and a significant risk to privacy.[69]

147. There is also a market for data in which consumers can participate. Personal information has been recognized by courts as extremely valuable. *See, e.g.*, *In re Marriott Int'l, Inc., Customer Data Sec. Breach Litig.*, 440 F. Supp. 3d 447, 462 (D. Md. 2020) ("Neither should the Court ignore what common sense compels it to acknowledge—the value that personal

---

[66] *See* https://www.healthcapital.com/researchmaterialdocuments/publishedarticles/Valuing%20Healthcare%20Data.pdf.

[67] *See* https://www.imprivata.com/blog/healthcare-data-new-prize-hackers (citing https://www.infopoint-security.de/media/TrustwaveValue_of_Data_Report_Final_PDF.pdf).

[68] *See* https://www.cnbc.com/2019/12/18/hospital-execs-say-theyre-flooded-with-requests-for-your-health-data.html.

[69] *See* https://time.com/4588104/medical-data-industry/.

identifying information has in our increasingly digital economy. Many companies, like Marriott, collect personal information. Consumers too recognize the value of their personal information and offer it in exchange for goods and services.”).

148. This economic value has been leveraged largely by corporations who pioneered the methods of its extraction, analysis, and use. However, the data also has economic value to Internet users. Market exchanges have sprung up where individual users like Plaintiffs herein can sell or monetize their own data.

149. Several companies, such as Google, Nielsen, UpVoice, HoneyGain, and SavvyConnect, have products through which they pay consumers for a license to track their data.[70]

150. Facebook has also paid users for their digital information, including browsing history. Until 2019, Facebook ran a “Facebook Research” app through which it paid $20 a month for a license to collect browsing history information and other communications from consumers between the ages of 13 and 35.

151. Additionally, healthcare data is extremely valuable to bad actors. Health care records may be valued at up to $250 per record on the black market.[71] These rates are assumed to be discounted because they do not operate in competitive markets, but rather, in an illegal marketplace. If a criminal can sell other Internet users’ stolen data, surely Internet users can sell their own data.

---

[70] *See 10 Apps for Selling Your Data for Cash*, https://wallethacks.com/apps-for-selling-your-data/.

[71] Tori Taylor, *Hackers, Breaches, and the Value of Healthcare Data* (June 30, 2021), https://www.imprivata.com/blog/healthcare-data-new-prize-hackers.

152. Healthcare data is incredibly valuable because, unlike a stolen credit card that can be easily canceled, most people are unaware that their medical information has been sold. Once it has been detected, it can take years to undo the damage caused.

153. In short, there is a quantifiable economic value to Internet users' data that is greater than zero. The exact number will be a matter for experts to determine.

154. By utilizing the Tracking Technologies, the cost of advertising and retargeting was reduced through further use of the unlawfully intercepted and disclosed Private Information, thereby benefitting Defendant while invading the privacy of Plaintiffs and Class Members and violating their rights under federal and Oregon law.

## REPRESENTATIVE PLAINTIFFS' EXPERIENCES

### ***PLAINTIFF ESTEP***

155. As a condition of receiving Defendant's services, Plaintiff Estep disclosed her Private Information to Defendant on several occasions, starting in approximately the summer of 2024.

156. Plaintiff Estep accessed Defendant's Website and the integrated appointment scheduling service on her phone to research and provide information regarding the dermatological services she received from Defendant for her specific skin condition.

157. Plaintiff Estep used Defendant's services to look up providers, review her specific skin condition, and request and book doctor's appointments for herself.

158. Plaintiff Estep has used and continues to use the same device to maintain and access an active Google account (and a Facebook account) throughout the relevant period.

159. The full scope of Defendant's interceptions and disclosures of Plaintiff's communications to Google and likely other third parties such as Facebook can only be determined

through formal discovery. However, Defendant intercepted at least communications about Plaintiff's patient status, medical skin condition, appointments, and the locations for receipt of healthcare.

160. Plaintiff Estep reasonably expected that her communications with Defendant via the Website were confidential, solely between herself and Defendant, and that such communications would not be transmitted to or intercepted by a third party.

161. However, as a result of the Tracking Technologies Defendant chose to install on its Website, Plaintiff Estep's Private Information was intercepted, viewed, analyzed and used by unauthorized third parties such as Google and likely others like Facebook.

162. Defendant transmitted Plaintiff Estep's unique identifiers including her Google user ID, device IP address and other device and unique online identifiers (including Facebook ones) to third parties like Google and Facebook. Defendant also transmitted information such as health and medical information including Plaintiff's particular skin condition, patient status and the fact that Plaintiff attempted to or did book a medical appointment.

163. Plaintiff Estep never consented to the disclosure of or use of her Private Information by third parties or to Defendant enabling third parties to access or interpret such information. Plaintiff Estep never consented to any third parties' receipt or use of her Private Information.

164. Notwithstanding, through the Tracking Technologies embedded on Defendant's Website, Defendant transmitted Plaintiff Estep's Private Information to, at a minimum, Google and likely other third parties such as Facebook.

165. As a result, Plaintiff Estep received targeted ads on her browsers inviting her to visit Frontier locations, even after she had made use of its services.

166. By making these disclosures without her consent, Defendant breached Plaintiff Estep's privacy and unlawfully disclosed her Private Information.

167. Defendant did not inform Plaintiff Estep that it had shared her Private Information with Google or any other third parties.

168. Plaintiff Estep has a continuing interest in ensuring that her Private Information, which, upon information and belief, remains backed up in Defendant's possession, is protected and safeguarded from future unauthorized disclosure(s).

***PLAINTIFF RISSLER***

169. As a condition of receiving Defendant's services, Plaintiff Rissler disclosed his Private Information to Defendant on several occasions starting in early 2026.

170. Plaintiff Rissler accessed Defendant's Website and the integrated appointment scheduling service on his phone to research and provide information regarding the dermatological services he received from Defendant for his specific skin condition.

171. Plaintiff Rissler used Defendant's services to look up providers, review his specific skin condition, and request and book doctor's appointments for himself.

172. Plaintiff Rissler has used and continues to use the same device to maintain and access an active Google account throughout the relevant period.

173. The full scope of Defendant's interceptions and disclosures of Plaintiff Rissler's communications to Google and other third parties can only be determined through formal discovery. However, Defendant intercepted communications about Plaintiff's patient status, skin conditions, locations for healthcare, and the fact that he wanted to make (and did make) an appointment with Defendant.

174. Plaintiff Rissler reasonably expected that his communications with Defendant via the Website were confidential, solely between himself and Defendant, and that such communications would not be transmitted to or intercepted by a third party.

175. However, as a result of the Tracking Technologies Defendant chose to install on its Website, Plaintiff Rissler's Private Information was intercepted, viewed, analyzed, and used by unauthorized third parties.

176. Defendant transmitted Plaintiff Rissler's unique identifiers, including Google user IDs, device IP address, and other device and unique online identifiers to third parties like Google. Defendant also transmitted information such as health and medical information, including Plaintiff Rissler's particular skin conditions, patient status, and the fact that Plaintiff attempted to or did book a dermatological appointment.

177. Plaintiff Rissler never consented to the disclosure or use of his Private Information by third parties, nor did he consent to Defendant enabling third parties to access or interpret such information.

178. Notwithstanding, through the Tracking Technologies embedded on Defendant's Website, Defendant transmitted Plaintiff Rissler's Private Information to, at a minimum, Google and likely other third parties such as Facebook.

179. As a result, Plaintiff Rissler received targeted ads on his browsers inviting him to visit Frontier locations, even after he had made use of its services.

180. By making these disclosures without his consent, Defendant breached Plaintiff Rissler's privacy and unlawfully disclosed his Private Information.

181. Defendant did not inform Plaintiff Rissler that it had shared his Private Information with Google or any other third parties.

182. Plaintiff Rissler has a continuing interest in ensuring that his Private Information, which, upon information and belief, remains backed up in Defendant's possession, is protected and safeguarded from future unauthorized disclosure(s).

## TOLLING

183. Any applicable statutes of limitation have been tolled by Defendant's knowing and active concealment of the incorporation of Google's Tracking Technologies onto the Website.

184. The Tracking Technologies on the Website were and are invisible to the average website visitor.

185. Through no fault or lack of diligence, Plaintiffs and Class Members were deceived and could not reasonably discover Defendant's deception and unlawful conduct.

186. Plaintiffs were ignorant of the information essential to pursue their claims, without any fault or lack of diligence on their part.

187. Defendant had exclusive knowledge that the Website incorporated the Tracking Technologies and yet failed to disclose to patients and potential patients, including Plaintiffs and Class Members, that by making appointments via the Website, Plaintiffs' and Class Members' Private Information would be disclosed or released to unauthorized third parties, including Google.

188. Under the circumstances, Defendant was under a duty to disclose the nature, significance, and consequences of its collection and treatment of its patients' and potential patients' Private Information. In fact, to the present, Defendant has not conceded, acknowledged, or otherwise indicated to its patients or potential patients that it has disclosed or released their Private Information to unauthorized third parties. Accordingly, Defendant is estopped from relying on any statute of limitations.

189. Moreover, all applicable statutes of limitation have also been tolled pursuant to the discovery rule.

190. The earliest that Plaintiffs or Class Members, acting with due diligence, could have reasonably discovered Defendant's conduct would have been shortly before the filing of this Complaint.

## CLASS ACTION ALLEGATIONS

191. Plaintiffs Estep and Rissler bring this action on behalf of themselves and on behalf of all other persons similarly situated ("the Class") pursuant to Rule 23(b)(2), 23(b)(3) and 23(c)(4) of the Federal Rules of Civil Procedure.

192. The Nationwide Class that Plaintiffs seek to represent is defined as follows:

> All individuals residing in the United States who used the Frontier Website and whose confidential PII and PHI were shared with third parties through Tracking Technologies on Frontier's Website.

193. Excluded from the Class are Defendant, its agents, affiliates, parents, subsidiaries, any entity in which Defendant has a controlling interest, any Defendant officer or director, any successor or assign, and any Judge who adjudicates this case, including their staff and immediate family.

194. Plaintiffs reserve the right to modify or amend the definition of the proposed class before the Court determines whether certification is appropriate.

195. Numerosity, Fed. R. Civ. P. 23(a)(1). The Class Members are so numerous that joinder of all members is impracticable. Upon information and belief, there are hundreds of thousands of individuals whose PII and PHI may have been improperly disclosed to Google, and the Class is identifiable within Defendant's records.

196. Commonality, Fed. R. Civ. P. 23(a)(2) and (b)(3). Questions of law and fact common to the Class exist and predominate over any questions affecting only individual Class Members. These include:

a. Whether and to what extent Defendant had a duty to protect the Private Information of Plaintiffs and Class Members;

b. Whether Defendant had duties not to disclose the Private Information of Plaintiffs and Class Members to unauthorized third parties;

c. Whether Defendant adequately, promptly and accurately informed Plaintiffs and Class Members that their Private Information would be disclosed to third parties;

d. Whether Defendant engaged in unfair, unlawful, or deceptive practices by disclosing the Private Information of Plaintiffs and Class Members;

e. Whether Plaintiffs and Class Members are entitled to actual, consequential, and/or nominal damages as a result of Defendant's wrongful conduct; and

f. Whether Plaintiffs and Class Members are entitled to injunctive relief to redress the imminent and currently ongoing harm faced as a result of Defendant's disclosure of their Private Information.

197. Typicality, Fed. R. Civ. P. 23(a)(3). Plaintiffs' claims are typical of those of other Class Members because all had their Private Information compromised as a result of Defendant's incorporation of the Tracking Technologies, due to Defendant's misfeasance.

198. Adequacy, Fed. R. Civ. P. 23(a)(4). Plaintiffs will fairly and adequately represent and protect the interests of the Class Members in that Plaintiffs have no conflicts of interest that would be antagonistic to those of the other Class Members. Plaintiffs have also retained counsel

experienced in complex class action litigation, and Plaintiffs intend to prosecute this action vigorously.

199. Superiority and Manageability, Fed. R. Civ. P. 23(b)(3). Class litigation is an appropriate method for fair and efficient adjudication of the claims involved. Class action treatment is superior to all other available methods for the fair and efficient adjudication of the controversy alleged herein; it will permit a large number of Class Members to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense that hundreds of individual actions would require. Class action treatment will permit the adjudication of relatively modest claims by certain Class Members, who could not individually afford to litigate a complex claim against a large corporation like Defendant. Further, even for those Class Members who could afford to litigate such a claim, it would still be economically impractical and impose a burden on the courts.

200. Policies Generally Applicable to the Class, Fed. R. Civ. P. 23(b)(2). Defendant has acted or refused to act on grounds generally applicable to the Class, thereby requiring the Court's imposition of uniform relief to ensure compatible standards of conduct toward the Class Members and making final injunctive relief appropriate with respect to the Class as a whole. Defendant's policies challenged herein apply to and affect Class Members uniformly and Plaintiffs' challenge of these policies hinges on Defendant's conduct with respect to the Class as a whole.

201. Issue Certification, Fed. R. Civ. P. 23(c)(4). Likewise, particular issues are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein. Such particular issues include, but are not limited to, the following:

a. Whether Defendant owed a legal duty to not disclose Plaintiffs' and Class Members' Private Information;

b. Whether Defendant breached a legal duty to Plaintiffs and Class Members to exercise due care in maintaining the confidentiality of their Private Information;

c. Whether Defendant failed to comply with its own policies and applicable laws, regulations, and industry standards relating to the confidentiality of patient Private Information;

d. Whether Defendant adequately and accurately informed Plaintiffs and Class Members that their Private Information would be disclosed to third parties; and

e. Whether Class Members are entitled to actual, consequential, and/or nominal damages, and/or injunctive relief as a result of Defendant's wrongful conduct.

## CAUSES OF ACTION

### COUNT I
### VIOLATIONS OF ELECTRONIC COMMUNICATIONS PRIVACY ACT
### 18 U.S.C. § 2511(1), *et seq.*
### UNAUTHORIZED INTERCEPTION, USE AND DISCLOSURE
### (*On Behalf of Plaintiffs & the Nationwide Class*)

202. Plaintiffs repeat and re-allege each and every allegation contained in the Complaint as if fully set forth herein.

203. The ECPA prohibits the intentional interception of the content of any electronic communication. 18 U.S.C. § 2511.

204. The ECPA protects both sending and receipt of communications.

205. 18 U.S.C. § 2520(a) provides a private right of action to any person whose wire or electronic communications are intercepted, disclosed, or intentionally used in violation of Chapter 119.

206. **Electronic Communications**. The transmission of Private Information between Plaintiffs and Class Members and Defendant via its Website with which they chose to exchange communications are "transfer[s] of signs, signals, writing,…data, [and] intelligence of [some] nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic, or photooptical system that affects interstate or foreign commerce" and are therefore "electronic communications" within the meaning of 18 U.S.C. § 2510(12).

207. **Content.** The ECPA defines content, when used with respect to electronic communications, to "include[] *any* information concerning the substance, purport, or meaning of that communication." 18 U.S.C. § 2510(8) (emphasis added).

208. **Interception.** The ECPA defines interception as the "acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device" and "contents … include any information concerning the substance, purport, or meaning of that communication." 18 U.S.C. § 2510(4), (8).

209. **Electronic, Mechanical, or Other Device**. The ECPA defines "electronic, mechanical, or other device" as "any device … which can be used to intercept a[n] … electronic communication[.]" 18 U.S.C. § 2510(5).

210. The following constitute "devices" within the meaning of 18 U.S.C. § 2510(5):

a. The cookies Defendant and third parties, such as Google, use to track Plaintiffs' and Class Members' communications;

b. Plaintiffs' and Class Members' browsers;

c. Plaintiffs' and Class Members' computing devices;

d. Defendant's web-servers; and

e. The Tracking Technologies deployed by Defendant to effectuate the sending and acquisition of patient communications.

211. Whenever Plaintiffs and Class Members interacted with Defendant's Website, Defendant, through the Tracking Technologies embedded and operating on its Website, contemporaneously and intentionally disclosed, and endeavored to disclose the contents of Plaintiffs' and Class Members' electronic communications to third parties, including Google (and likely Facebook) without authorization or consent, and knowing or having reason to know that the electronic communications were obtained in violation of the ECPA. 18 U.S.C. § 2511(1)(c).

212. Whenever Plaintiffs and Class Members interacted with Defendant's Website, Defendant, through the Tracking Technologies embedded and operating on its Website, contemporaneously and intentionally used, and endeavored to use the contents of Plaintiffs' and Class Members' electronic communications, for purposes other than providing health care services to Plaintiffs and Class Members without authorization or consent, and knowing or having reason to know that the electronic communications were obtained in violation of the ECPA. 18 U.S.C. § 2511(1)(d).

213. Whenever Plaintiffs and Class Members interacted with Defendant's Website, Defendant, through the Tracking Technologies it embedded, configured and operated on its Website, contemporaneously and intentionally disclosed the contents of Plaintiffs' and Class Members' electronic communications while those communications were in transmission, to persons or entities other than an addressee or intended recipient of such communication, including Google and other third parties.

214. Defendant's intercepted communications include, but are not limited to, the contents of communications to and from Plaintiffs and Class Members regarding PII and PHI, treatment, and scheduling details.

215. Additionally, through the above-described Tracking Technologies and intercepted communications, this information was, in turn, used by third parties, such as Google, to (1) place Plaintiffs in specific health-related categories and (2) target Plaintiffs with advertising associated with Plaintiffs' specific health conditions.

216. By intentionally disclosing or endeavoring to disclose the electronic communications of Plaintiffs and Class Members to third-party marketers, data brokers, and other third parties, while knowing or having reason to know that the information was obtained through the interception of an electronic communication in violation of 18 U.S.C. § 2511(1)(a), Defendant violated 18 U.S.C. § 2511(1)(c).

217. By intentionally using, or endeavoring to use, the contents of the electronic communications of Plaintiffs and Class Members, while knowing or having reason to know that the information was obtained through the interception of an electronic communication in violation of 18 U.S.C. § 2511(1)(a), Defendant violated 18 U.S.C. § 2511(1)(d).

218. Defendant intentionally used the wire or electronic communications to increase its profit margins. Defendant specifically used the Tracking Technologies to track and utilize Plaintiffs' and Class Members' PII and PHI for financial gain.

219. Defendant was not acting under color of law to intercept and disclose Plaintiffs' and Class Members' wire or electronic communication.

220. Plaintiffs and Class Members did not authorize Defendant to acquire the content of their communications for purposes of disclosing those communications to third parties in violation of HIPAA and invading Plaintiffs' privacy via the Tracking Technologies.

221. Any purported consent that Defendant received from Plaintiffs and Class Members was not valid.

222. **Unauthorized Purpose**. Defendant intentionally intercepted the contents of Plaintiffs' and Class Members' electronic communications for the purpose of committing a tortious or criminal act in violation of the Constitution or laws of the United States or of any State—namely, to disclose that interception in violation of HIPAA and invasion of privacy, among others.

223. **Any party exception in 18 U.S.C. § 2511(2)(d) does not apply.** The party exception in § 2511(2)(d) does not permit a party that intercepts or causes interception to escape liability if the communication is intercepted for the purpose of committing any tortious or criminal act in violation of the Constitution or laws of the United States or of any State.

224. Defendant is a "party to the communication" with respect to patient communications. However, Defendant's simultaneous, unknown duplication, forwarding and disclosure of Plaintiffs' and Class Members' Private Information does not qualify for the party exemption.

225. Here, as alleged above, Defendant violated provision 42 U.S.C. § 1320d-6(a)(3) of the Health Insurance Portability and Accountability Act. This provision imposes a criminal penalty for knowingly disclosing individually identifiable health information to a third party. HIPAA defines IIHI as:

> any information, including demographic information collected from an individual, that—(A) is created or received by a health care

> provider ... (B) ***relates to the past, present, or future physical or mental health or condition of an individual, the provision of health care to an individual, or the past, present, or future payment for the provision of health care to an individual***, and (i) identifies the individual; or (ii) with respect to which there is a reasonable basis to believe that the information can be used to identify the individual.[72]

226. Plaintiffs' information that Defendant disclosed to third parties qualifies as IIHI, and Defendant's disclosure violated Plaintiffs' expectations of privacy, and constitutes tortious and criminal conduct through a violation of 42 U.S.C. § 1320d-6. Defendant specifically used the Tracking Technologies to track and utilize Plaintiffs' and Class Members' PII and PHI for financial gain.

227. The penalty for violation is enhanced where "the offense is committed with intent to sell, transfer, or use individually identifiable health information for commercial advantage, personal gain, or malicious harm." 42 U.S.C. § 1320d-6.

228. Defendant's conduct violated 42 U.S.C. § 1320d-6 in that it:

a. Used and caused to be used cookie identifiers associated with specific patients without patient authorization; and

b. Disclosed IIHI to Google without patient authorization.

229. Defendant's conduct would be subject to the enhanced provisions of 42 U.S.C. § 1320d-6 because Defendant's use of Google and likely other third parties such as Facebook's source code was for Defendant's commercial advantage to increase revenue from existing patients and gain new patients.

230. Healthcare patients have the right to rely upon the promises that companies make to them. Defendant accomplished its tracking and retargeting through deceit and disregard, such

---

[72] 42 U.S.C. § 1320d(6) (emphasis added).

that an actionable claim may be made, in that it was accomplished through source code that causes Google tracking codes and cookies (including but not limited to the _ga and cid cookies) and other tracking technologies to be deposited on Plaintiffs' and Class Members' computing devices as "first-party" cookies that are not blocked.

231. These "first party" cookies commanded Plaintiffs' and Class Members' computing devices to redirect and disclose their data and the content of their communications with Defendant to Google and likely other unauthorized third parties.

232. Defendant knew or had reason to know that the _ga and cid cookies would command Plaintiffs' and Class Members' computing devices to remove, redirect and disclose their data and the content of their communications with Defendant to Google and others.

233. Defendant's scheme or artifice to defraud in this action consists of: (a) the false and misleading statements and omissions in its privacy policy set forth above, including the statements and omissions recited in the claims below and (b) the placement of the _ga and cid cookies on patient computing devices disguised as a first-party cookie on Defendant's Website rather than a third-party cookie from Google.

234. Defendant acted with the intent to defraud in that it willfully invaded and took Plaintiffs' and Class Members' property rights (a) to the confidentiality of Private Information and their right to determine whether such information remains confidential and exclusive right to determine who may collect and use such information for marketing purposes and (b) to determine who has access to their computing devices.

235. As such, Defendant cannot viably claim any exception to ECPA liability.

236. Plaintiffs and Class Members have suffered damages as a direct and proximate result of Defendant's invasion of privacy in that:

a. Learning that Defendant has intruded upon, intercepted, transmitted, shared, and used their individually identifiable patient health information (including information about their skin health symptoms, conditions, treatments and concerns, dermatological appointments, healthcare providers and locations) for commercial purposes has caused Plaintiffs and the Class Members to suffer emotional distress;

b. Defendant received substantial financial benefits from its use of Plaintiffs' and Class Members' PII and PHI without providing any value or benefit to Plaintiffs or the Class Members;

c. Defendant received substantial, quantifiable value from its use of Plaintiffs' and Class Members' PII and PHI, such as understanding how people use its Website without providing any value or benefit to Plaintiffs or the Class Members;

d. Defendant has failed to provide Plaintiffs and the Class Members with the full value of the dermatological services for which they paid, which included a duty to maintain the confidentiality of their patient information; and

e. The diminution in value of Plaintiffs' and Class Members' PII and PHI and the loss of privacy due to Defendant making sensitive and confidential information, such as patient status, skin conditions, and appointments that Plaintiffs and Class Members intended to remain private no longer private.

237. As a result of Defendant's violation of the ECPA, Plaintiffs and Class Members are entitled to all damages available under 18 U.S.C. § 2520, including statutory damages of whichever is the greater of $100 a day for each day of violation or $10,000, equitable or declaratory relief, compensatory and punitive damages, and attorney's fees and costs.

**COUNT II**
**BREACH OF CONFIDENCE**
**(*On Behalf of Plaintiffs & the Nationwide Class*)**

238. Plaintiffs repeat and re-allege each and every allegation contained in the Complaint as if fully set forth herein.

239. Possessors of non-public medical information, such as Frontier, have a duty to keep such medical information completely confidential.

240. Plaintiffs and Class Members had reasonable expectations of privacy in the responses and communications entrusted to Frontier through its Website, which included highly sensitive Private Information.

241. Contrary to its duties as a healthcare provider and its express promises of confidentiality, Frontier installed the Tracking Technologies to disclose and transmit to third parties Plaintiffs' and Class Members' Private Information, including data related to Plaintiffs' and Class Members' skin health.

242. These disclosures were made without Plaintiffs' or Class Members' knowledge, consent, or authorization.

243. The third-party recipients included, but may not be limited to, Google and likely other third parties such as Facebook.

244. As a direct and proximate result of Frontier's unauthorized disclosures of Plaintiffs' and Class Members' Private Information, Plaintiffs and Class Members were damaged by Frontier's breach of confidentiality in that (a) sensitive and confidential information that Plaintiffs and Class Members intended to remain private is no longer private; (b) Plaintiffs and Class Members face ongoing harassment and embarrassment in the form of unwanted targeted advertisements; (c) Frontier eroded the essential confidential nature of dermatological services that

Plaintiffs and Class Members participated in; (d) general damages for invasion of their rights in an amount to be determined by a jury at trial; (e) nominal damages for each independent violation; (f) the unauthorized use of something of value (the highly sensitive Private Information) that belonged to Plaintiffs and Class Members and the obtaining of a benefit therefrom without Plaintiffs' and Class Members' knowledge or informed consent and without compensation to Plaintiffs or Class Members for the unauthorized use of such data; (g) diminishment of the value of Plaintiffs' and Class Members' Private Information; and (h) violation of the property rights Plaintiffs and Class Members have in their Private Information.

**COUNT III**
**INVASION OF PRIVACY**
**(*On Behalf of Plaintiffs & the Nationwide Class*)**

245. Plaintiffs repeat and re-allege each and every allegation contained in the Complaint as if fully set forth herein.

246. A plaintiff asserting claims for intrusion upon seclusion must plead (1) that the defendant intentionally intruded into a place, conversation, or matter as to which plaintiff has a reasonable expectation of privacy; and (2) that the intrusion was highly offensive to a reasonable person.

247. Frontier's disclosure of Plaintiffs' and Class Members' sensitive data, including PII, dermatological health information, appointment requests and other interactions on the Frontier Website, to third parties like Google constitutes an intentional intrusion upon Plaintiffs' and Class Members' solitude or seclusion.

248. Plaintiffs and Class Members had a reasonable expectation of privacy in the health information and other personal data that Frontier disclosed to third parties. Plaintiffs' health information, appointment requests, and other interactions with the Frontier Website are inherently

sensitive in nature. Plaintiffs and Class Members reasonably expected this information would remain private and confidential and would not be disclosed to third parties without their consent.

249. This expectation is especially heightened given Frontier's representations to users that this information would be safeguarded and not disclosed to third parties.

250. Plaintiffs and Class Members did not consent to, authorize, or know about Frontier's intrusion at the time it occurred. Accordingly, Plaintiffs and Class Members never agreed that Frontier could disclose their data to third parties.

251. The surreptitious disclosure of sensitive data, including PII and PHI from thousands of individuals was highly offensive because it violated expectations of privacy that have been established by social norms. Polls and studies show that the overwhelming majority of Americans believe one of the most important privacy rights is the need for an individual's affirmative consent before personal data is collected or shared.

252. The offensiveness of this conduct is all the more apparent because Frontier's disclosure of this information was conducted in secret in a manner that Plaintiffs and Class Members would be unable to detect, contrary to the actual representations made by Frontier.

253. As a result of Frontier's actions, Plaintiffs and Class Members have suffered harm and injury, including but not limited to an invasion of their privacy rights.

254. Plaintiffs and Class Members have been damaged as a direct and proximate result of Frontier's invasion of their privacy and are entitled to just compensation, including monetary damages.

255. Plaintiffs and Class Members seek appropriate relief for that injury, including but not limited to damages that will reasonably compensate Plaintiffs and Class Members for the harm

to their privacy interests as well as a disgorgement of profits made by Frontier as a result of its intrusions upon Plaintiffs' and Class Members' privacy.

256. Plaintiffs and Class Members are also entitled to punitive damages resulting from the malicious, willful, and intentional nature of Frontier's actions, directed at injuring Plaintiffs and Class Members in conscious disregard of their rights. Such damages are needed to deter Defendant from engaging in such conduct in the future.

257. Plaintiffs also seek such other relief as the Court may deem just and proper.

**COUNT IV**
**UNJUST ENRICHMENT**
**(*On Behalf of Plaintiffs & the Nationwide Class*)**

258. Plaintiffs repeat and re-allege each and every allegation contained in the Complaint as if fully set forth herein.

259. Defendant benefits from the use of Plaintiffs' and Class Members' Private Information and unjustly retained those benefits at their expense.

260. Plaintiffs and Class Members conferred a benefit upon Defendant in the form of Private Information that Defendant collected from Plaintiffs and Class Members, which Defendant used, without authorization or compensation, beyond the limited purpose for which it was provided.

261. Plaintiffs and Class Members conferred a monetary benefit upon Defendant in the form of valuable sensitive health information that Defendant collected from Plaintiffs and Class Members under the guise of keeping this information private. Defendant collected, used and disclosed this information for its own gain including for advertisement purposes, sale or trade for valuable services from third parties.

262. Plaintiffs and Class Members would not have used Defendant's services or would have paid less for those services, if they had known that Defendant would collect, use, and disclose this information to third parties.

263. Defendant exceeded any authorization given and instead consciously disclosed and used this information for its own gain, providing Defendant with economic, intangible, and other benefits, including substantial monetary compensation.

264. Defendant unjustly retained those benefits at the expense of Plaintiffs and Class Members because Defendant's conduct damaged Plaintiffs and Class Members, all without providing any commensurate compensation to Plaintiffs and Class Members.

265. Defendant appreciated or had knowledge of the benefits conferred upon it by Plaintiffs and Class Members.

266. As a result of Defendant's conduct, Plaintiffs and Class Members suffered actual damages in an amount equal to the difference in value between their purchases of medical services made with reasonable data privacy and security practices and procedures that Plaintiffs and Class Members paid for, and those purchases without reasonable data privacy and security practices and procedures that they received.

267. The benefits that Defendant derived from Plaintiffs and Class Members were not offered by Plaintiffs and Class Members gratuitously and rightly belong to Plaintiffs and Class Members. It would be against equity and good conscience for Defendant to be permitted to retain any of the profit or other benefits wrongly derived from the unfair and unconscionable methods, acts and trade practices alleged in this Complaint.

268. Defendant should be compelled to disgorge into a common fund for the benefit of Plaintiffs and Class Members all unlawful or inequitable proceeds that Defendant received, and such other relief as the Court may deem just and proper.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs Estep and Rissler, on behalf of themselves and Class Members, request judgment against Frontier and that the Court grant the following Order:

A. certifying the Class and appointing Plaintiffs and Counsel to represent such Class;

B. awarding equitable relief enjoining Defendant from engaging in the wrongful conduct alleged in this Complaint pertaining to the misuse and disclosure of the Private Information of Plaintiffs and Class Members;

C. awarding injunctive relief requested by Plaintiffs, including, but not limited to, injunctive and other equitable relief as is necessary to protect the interests of Plaintiffs and Class Members;

D. awarding damages, including, but not limited to, actual, consequential, statutory, punitive, and nominal damages, as allowed by law in an amount to be determined;

E. awarding attorneys' fees, costs, and litigation expenses, as allowed by law;

F. awarding prejudgment interest on all amounts awarded; and

G. awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiffs Estep and Rissler hereby demand that this matter be tried before a jury.

//

//

Dated: November 6, 2026

*/s/ Kaleigh N. Boyd*
Kaleigh N. Boyd (OSB #253094)
kboyd@mcnaul.com
**McNAUL EBEL PLLC**
600 University Street, Suite 2700
Seattle, Washington 98101
Tel: (206) 467-1816
Fax: (206) 624-5128

Elena A. Belov*
Britany Wessan*
**ALMEIDA LAW GROUP LLC**
849 W. Webster Avenue
Chicago, Illinois 60614
Tel: (708) 529-5418
elena@almeidalawgroup.com
britany@almeidalawgroup.com

*Attorneys for Plaintiffs and*
*the Proposed Class*

**Pro Hac Vice Forthcoming*